IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

EVELYN ROMERO
and RICKY ROMERO,

      Plaintiffs,

  vs.               CIVIL NO.  08-257 LFG/RLP

CITY OF SANTA FE, SANTA FE
POLICE DEPARTMENT, ROBERT
VASQUEZ, and GARY JOHNSON,

      Defendants.

## MEMORANDUM OPINION AND ORDER
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on the following cross-motions for summary judgment:

> Plaintiffs' Motion for Partial Summary Judgment on Liability of
> Defendant Robert Vazquez for Violation of Plaintiffs' Due Process
> Rights [Doc. 47] ("Plaintiffs' Motion"), and

> Defendants' Motion for Partial Summary Judgment on the Basis of
> Liability and Qualified Immunity [Doc. 58] ("Defendants' Motion").[1]

The Court considered the motions, responses, amended response, replies and amended reply, and

determines that oral argument is not necessary.

### Background[2]

This lawsuit arises in the aftermath of the tragic disappearance of a seven year-old child,

Robbie Romero, on June 7, 2000.  Robbie disappeared from his south side Santa Fe residence where

he lived with his parents, Rudy Sr. and Evelyn Romero, and his siblings, including Plaintiff Ricky

---

[1]Plaintiffs were allowed to file an amended response to Defendants' Motion and did so on April 22, 2010 [Doc. 76].  Defendants filed an amended reply on April 30, 2010 [Doc. 78].

[2]The Court provides this background section and summary of news reports for informational purposes only. The information in this section was not relied on in deciding the motions for summary judgment.

and an older brother Ronnie.  Shortly after Robbie's disappearance, suspicion for the disappearance of Robbie turned to his brother Ronnie, then aged 22.[3]

The somewhat tardy, but nonetheless massive, police investigation that ensued failed to locate Robbie or his remains.  Significant conflict arose between the Romero family and Santa Fe Police, and the conflict ultimately resulted in a police supervisor who was in charge of the investigation being demoted and ultimately terminated.  *See* Archuleta v. Santa Fe Police Dep't, 137 N.M. 161 (2005) (describing facts relating to supervisor's police employment and discipline).  A lawsuit relating to the release of police investigative files was also filed and litigated in New Mexico's trial and appellate courts.  *See* Estate of Rudy Romero, by Evelyn Romero v. City of Santa Fe, 139 N.M. 671 (2006).

During the many years following Robbie's disappearance, police believed that Ronnie was responsible for the boy's disappearance and suspected death.  Ultimately, in late 2005 to 2006, a grand jury was convened to hear evidence relating to the case.  Notwithstanding police officers' belief that the grand jury would return an indictment against Ronnie, the Motion in Limine pleadings in the present case [*see, e.g.,* Doc. 77], indicate that Ronnie was not indicted for Robbie's disappearance.

---

[3]Newspaper accounts of this high-profile disappearance alleged that Ronnie gave conflicting and contradictory information concerning matters leading up to Robbie's disappearance; he allegedly failed several lie detector examinations; there were hearsay reports about a confession made first by Ronnie and secondly by Ronnie's girlfriend; and, most curiously, allegations that Ronnie contacted police to inquire about the penalties for manslaughter, the unintentional or accidental killing of another.  Again, this information is provided only for background purposes and is not relied on in deciding the motions for summary judgment.

**Present Lawsuit**

On December 14, 2007, Plaintiffs Evelyn Romero ("Mrs. Romero") and Ricky Romero ("Ricky") filed this lawsuit against The City of Santa Fe, The Santa Fe Police Department, Robert Vasquez ("Det. Vasquez"), Gary Johnson, Beverly Lennen, and John Does 1-5.[4] [Doc. 1, Ex. A.] On March 10, 2008, Defendants removed the case to federal court. [Doc. 1.]

Plaintiffs' complaint seeks damages "for violation of property rights and deprivation of statutory and constitutional rights." [Doc. 1, Ex. A.] More specifically, Plaintiffs assert a claim for violation of their Fourteenth Amendment due process rights related to the alleged interference by Det. Vasquez[5] of the Santa Fe Police Department ("SFPD") with familial relations and the separation of the minor children Ricky and Marcos Romero ("Marcos") from their family home for a period of four days in December 2005. Plaintiffs argue that the separation and absence of the children from the Romero home was without notice or hearing and without the threat of imminent harm to justify an emergency removal. In addition, Plaintiffs assert that the alleged removal interfered with familial relations in violation of their substantive due process rights. [Doc. 47, pp. 1-2.]

The complaint further alleges that Det. Vasquez and Gary Johnson ("Lt. Johnson") entered the Romero residence without consent, without a warrant permitting entrance, and without a reasonable belief that any child in the home was in imminent danger of serious bodily harm. [Doc. 1, Ex. A, ¶ 31.] Thus, the complaint asserts a Fourth Amendment violation. The complaint includes

---

[4]In a Stipulated Order of Dismissal [Doc. 74], the parties agreed to dismiss Defendant Beverly Lennen and agreed to the dismissal of Defendants City of Santa Fe and the Santa Fe Police Department with respect to Plaintiffs' claims premised on 42 U.S.C. § 1983. The John Doe Defendants were dismissed previously.

[5]The parties clarified that the claims concerning the alleged removal of the minor children from the family home do not relate to Defendant Gary Johnson and instead are directed at Det. Vasquez. Gary Johnson is named only for his role in the search of Mrs. Romero's home in December 2005. [Doc. 59, p. 2, n. 2.]

similar claims brought in accordance with the New Mexico Tort Claims Act.  The claim of municipal liability is not pursued based on the parties' stipulation of dismissal as to Defendant Lennen, who initially was alleged to have approved and authorized the officers' actions, as an "expression of official policy" of the City of Santa Fe and SFPD.

In response to the allegations, Det. Vasquez generally states that both Mrs. Romero and Ricky were afraid of Ronnie, were concerned about Ronnie's erratic behavior and drug use, and previously expressed concerns to police over their personal safety.  Det. Vazquez further contends that he was worried about Ronnie's reaction towards his family when he learned that Mrs. Romero and Ricky, who were all living together, would be served with subpoenas to testify before the grand jury, a proceeding in which Ronnie was the target.  Det. Vazquez maintains that he acted only out of concern for the childrens' safety when he recommended or suggested that Ricky stay with his sister, and that Marcos,[6] who was already in the weekend custody of his paternal grandparents, remain with his grandparents.  Det. Vasquez denies that he took custody of the children, removed the children from their home, or prevented Ricky or Marcos from returning to Mrs. Romero's home. Both Ricky and Marcos returned to their home within four days.

Plaintiffs contend generally that Ricky's alleged removal from the family home and the directive to the grandparents that Marcos not be returned to his home violated their constitutional

---

[6]The Complaint alleges that Marcos is Mrs. Romero's adopted son who lived with her.  It is not clear that Mrs. Romero formally adopted Marcos.  However, it is undisputed that Marcos is the biological son of Mrs. Romero's daughter, Kristian Romero ("Kristian") who gave birth to Marcos when she was 14 years-old.  At all times pertinent to this complaint, Kristian was residing in the Phoenix, Arizona area. [Doc. 47, p. 5.] Plaintiffs state that Eileen Gabaldon-Hosemann and John Hosemann (referred to as Marcos' grandparents or "Hosemanns") are not Marcos' biological grandparents but that they take care of Marcos on weekends and were with the Hosemanns on the weekend in question in December 2005.  [Doc. 47, p. 5.] The Hosemanns told CYFD personnel that they believed their son was the biological father of Marcos although no paternity tests were done.  The Hosemanns stated they had Marcos with them almost every weekend since he was about 5 months old. [Doc. 64, Report attached to Nancy Baca Aff., Ex. 15-4.]

and statutory rights.  They claim they are entitled to an award of compensatory and punitive damages.

## Cross-Motions for Partial Summary Judgment

Plaintiff's motion seeks summary judgment on Det. Vasquez's liability for alleged violations of Plaintiffs' due process rights.  Thus, it is a motion for partial summary judgment directed only at the Fourteenth Amendment due process claims.

Defendants' motion also seeks partial summary judgment as to what they characterize as the Fourth, Fifth and Fourteenth Amendment claims as they relate to whether Defendants removed or took custody of Ricky and Marcos for the time period in question. [Doc. 59, p. 1.]  Defendants further assert that Det. Vasquez is entitled to qualified immunity on these claims.

Neither party requests summary judgment as to the alleged Fourth Amendment violation regarding an alleged illegal entry into the Romero home or the claims brought under the New Mexico Tort Claims Act.  Thus, this Order addresses only whether summary judgment should be granted in favor of either party as to the due process claims and whether Det. Vasquez is entitled to qualified immunity as to the due process claims.

## Material Facts

The following undisputed material facts are taken from the parties' summary judgment pleadings.  Disputed facts are so noted.

### *Pertinent Events Leading Up To (Friday) December 16, 2005*

On August 4, 2005, Mrs. Romero called a "911" operator of the SFPD and reported that her 27 year-old son, Ronnie, "is under the influence and I don't know what to do," that he was ""just really far gone," and "not in his right mind."  On August 5, 2005, Det. Vasquez interviewed Ricky (who was 16 years-old then)  about the 911 call his mother made the day before.  In the interview,

5

Ricky told Det. Vasquez that about a month and half earlier, he had seen Ronnie at home with another "guy," and they appeared to be arguing over money.  Ronnie chased the guy to his car. Ricky was not sure if Ronnie had a knife or gun or "whatever."   Ricky heard something like "scruffing" outside and did not know if they fought or not.  The guy drove off, and the next day the Romeros saw that Mrs. Romero's car tire was slashed.

Ricky told Det. Vasquez during the interview that he was afraid of Ronnie because he did not know what Ronnie's "next move" was and did not know what Ronnie would do or "what he's capable of doing from the stuff I've heard."  Ricky had seen Ronnie doing drugs and knew Ronnie kept a knife under his mattress and his drawer.  Ricky believed that Ronnie was capable of hurting him or someone else in the family because of "what drugs do to you."  Ronnie had told Ricky "I'll kill you," even when he was sober.  On one occasion, Ronnie threatened to kill his girlfriend and hide her body where no one would ever find it.

Ricky believed that his mother favored Ronnie.  At age 27, Ronnie was still living at home with his girlfriend and their two small children.  Ricky said Ronnie and his girlfriend fought a lot. Ronnie had said to Ricky that he had a gun but then he qualified the statement by saying it was a squirt gun.  In August 2005, Ricky told Det. Vasquez "seriously I don't want to be around him until everything is solved."  Ricky said he did not want to be around him at all because he was feared and did not trust Ronnie.  Det. Vasquez told Ricky he (the detective) would take a restraining order to the house for his mom and Ricky to fill out against Ronnie because Ricky did not want Ronnie in the house.  Even with a restraining order, Ricky said he was not sure whether Ronnie still might show up when his mother was at work.

Det. Vasquez then asked Ricky if he wanted to be in a different place for his safety.  Ricky asked if that would be with his family, and Det. Vasquez said yes.  Ricky agreed if it was with his

family and said his sister Leslie would be the person with whom he wished to stay.  Det. Vasquez told Ricky "we'll talk to Leslie now and see what we can do."

This conversation occurred in early August 2005, and there is no evidence that Ricky then stayed with Leslie or that any other complaints were made about Ronnie until December 2005.

On December 7, 2005, Det. Vasquez received a telephone call from another police officer stating that officer received a call from Andy Dean ("Andy), who is Ricky's aunt and Mrs. Romero's sister.  Andy told the police officer that she was concerned for Ricky's safety.  Plaintiffs raise hearsay objections as to the alleged call by Andy.

On December 8, 2005, Det. Vasquez spoke to Andy, who stated Ricky wanted to leave Mrs. Romero's house because he felt unsafe in the house.  He asked Andy to pick him up and take him to her house.  According to Andy, Mrs. Romero was also walking out of her house and heading to her own parents' house because she did not want to stay around the house with Ronnie behaving as he was.

These alleged facts are set forth in Det. Vasquez's police report that Plaintiffs attach to their motion.  [Doc. 47, p. 4, Ex. 1.]  Indeed, Plaintiffs rely on portions of Vasquez's police report and narrative.  However, Plaintiffs dispute that Ricky spoke to his aunt on December 7 or that Det. Vasquez spoke to Andy on Dec. 8.  The same or similar facts are documented in CYFD's later report regarding a conversation between CYFD personnel and Andy.  Plaintiffs did not provide evidence that a factual controversy exists regarding the December 7-8 conversations.  Moreover, the hearsay objection does not create a factual dispute.  The conversations are not offered for the truth of the matter, but rather, to establish Det. Vasquez's state of mind when he met with Ricky on December 16, 2005.  Thus, the facts concerning the December 7 and 8 conversations are deemed undisputed.

Defendants contend that on December 15, 2005, Det. Vasquez spoke to Ricky about concerns for Ricky's safety based on the earlier conversation with Andy.  According to Det. Vasquez, on December 15, Ricky advised him that he was afraid of Ronnie because he was using cocaine then.  Ricky said he was staying with his Aunt Andy at this time.  However, in Ricky's affidavit, dated March 26, 2010 [Doc. 64, Ex. 13]. Ricky states he did not speak to Det. Vasquez on December 15, did not complain of Ronnie's behavior on that date, had no knowledge of Ronnie's drug use then, and did not spend a night with Andy in December 2005.  Thus, these facts are disputed.[7]

### December 16, 2005 - December 20, 2005

These are the key dates relating to Plaintiffs' claims.  Plaintiffs allege that for these four days they suffered damages based on the removal of Ricky and Marcos from the family home.[8]  CYFD conducted an investigation during this time period and concluded that the allegations of neglect or imminent danger to the children were unsubstantiated.  The children were in the family home by December 20, 2005.

On December 16, 2005, Det. Vasquez was assigned to serve grand jury subpoenas on members of the Romero family, including Mrs. Romero and Ricky.  In the afternoon of December 16th, Det. Vasquez visited the Romero home and met with Ricky, who was the only person home.  Det. Vasquez was driving an unmarked police car and was not dressed in a police uniform.  There

---

[7]Defendants also rely on a report by an investigator for Children, Youth and Families Department ("CYFD"), who interviewed Andy on December 19, 2005, and Andy again said Ricky had called her to pick him up in early December because Ronnie was home and acting strangely. [Doc. 59, p. 13, Ex. D, "portions of deposition of Matthew Esquibel. . . ."] The Court does not understand what Exhibit D is.  The cover page indicates Esquibel was having his deposition taken on April 21, 2009, but there are no deposition pages attached. [Ex. D.]  Instead, there is an incomplete narrative that may or may not have been prepared by Esquibel.

[8]Marcos would have been gone two to three days of that four-day period anyway because it was a weekend when he typically was with the Hosemanns, who had picked him up on Friday, December 16, 2005.  To the extent, Marcos was "removed" from the family home during this time, it was for the single day of December 20, 2005.

were approximately two other officers with Det. Vasquez when he spoke to Ricky.  Det. Vasquez served the subpoena on Ricky, and Ricky understood Ronnie was the target of the grand jury investigation.

Defendants contend that Ricky told Det. Vasquez on this date that he was afraid of Ronnie and that Ricky preferred to leave his mother's home while Ronnie was there.  Det. Vasquez testified that he discussed concerns about Ricky's safety and wanted Ricky to stay with his sister, Leslie.  Det. Vasquez further testified that his concerns were based on the August 4, 2005 report, his interview with Ricky on August 5, his conversations with Andy on December 8, and his conversation with Ricky on December 15, some of which are disputed.  According to Det. Vasquez, he watched Ricky pack his clothing and saw Ricky get in Ricky's own vehicle, which Ricky voluntarily drove to stay with his sister Leslie.  Ricky would have stayed with Andy but because she was leaving for the weekend, Ricky chose Leslie.  Det. Vasquez had no authority to say whether Ricky was free to go or stay at his home one December 16.

With the exception of the last line, the facts in the above paragraph are disputed.  Ricky's affidavit states that he told Det. Vasquez he felt "fine" that day but that Det. Vasquez instructed him to pack his things and that he was going to take Ricky out of the house.  When asked who he wanted to stay with, Ricky said his sister Leslie, because he knew he had to stay somewhere other than the Romero home.  Ricky did not tell Det. Vasquez he was afraid of Ronnie on that occasion, nor did he state he wanted to leave the house while Ronnie was living at the house.  Det. Vasquez followed Ricky to his room and watched him pack his things.  Ricky stated he got into a dark colored car and "we went directly to my sister Leslie's apartment.  I sat in the back seat behind the passenger seat. Det. Vasquez drove the vehicle.  There was a female passenger in the front seat who I didn't know."

[Doc. 64, Ex. 13, ¶ 13.] Ricky further testified that he had no car to drive and did not drive a car to Leslie's place.

Defendants attached to their reply an affidavit by Carlos Baca, who worked with the SFPD and accompanied Det. Vasquez on December 16, 2005, when Vasquez served a subpoena on Ricky. Mr. Baca's affidavit states that he remained in the car while Det. Vasquez went to serve Ricky, and Baca recorded the conversation between Det. Vasquez and Ricky. Baca further testified that he saw Ricky enter Ricky's vehicle and drive off after his conversation with Det. Vasquez, and that he and Det. Vasquez did not drive Ricky anywhere on December 16, 2005. Baca stated he would have remembered driving Ricky in the police car, if that had happened, because he had his recording devices set up in the backseat. [Doc. 78, Ex. H.]

Ricky contends he did not leave his home on December 16 voluntarily, but rather, because Det. Vasquez was a police officer and told him to go. Ricky stated he felt he had to stay with Leslie at that point and could not return home until after he testified at the grand jury proceedings on January 19, 2006. Ricky stated he spent the nights of December 16 and 17 with Leslie, but stayed with his Aunt Cindy on December 18 and 19.

The transcript of Det. Vasquez's "belt" tape (Doc. 59, Ex. F), perhaps the "best evidence" as to the conversation between Ricky and Det. Vasquez on December 16 is disputed and some portions are inaudible.[9] The transcription may reflect disputes in Det. Vasquez's testimony. For

---

[9]In Defendants' motion, they note Plaintiffs' characterization of this tape (CH1) as being "audio challenged," whereas Det. Vasquez swore to the accuracy of the transcription in his Affidavit. Moreover, Defendants state they provided the "disks" of the recordings to the Court for review. A quick look at the transcript of the tape reveals that much of the conversation is noted as "inaudible." The Court declines the role of listening and deciphering taped conversations that cannot be heard. The Court agrees that the tape is essentially undecipherable as to some of the content. Moreover, the tape lasts 1.5 hours, according to Plaintiffs. [Doc. 47, p. 7.] In addition, Plaintiffs state that tape CH5, which contains recorded conversations between Det. Vasquez and perhaps other officers with Mrs. Romero on December 15, 2005 is audio challenged and lasts almost one hour.

example, the transcript indicates Det. Vasquez told Ricky: "I need for you to bring your – get some stuff and (inaudible) and we'll help you out.  Who would you want to stay with?"  Det. Vasquez told Ricky his mother did not yet know about this (Ricky staying elsewhere) but that Det. Vasquez would tell her.  "So she'll be all pissed off if she knows we're talking (inaudible) gave you a ride to your sister's house."  Det. Vasquez states: "I'd feel better if you (inaudible)."  Det. Vasquez then called Leslie and asked if it was all right if Ricky stayed with her for the next "while."  "What I'm going to do now is I'm going to get Ricky's clothes – we're going to get his clothes and he is going to take his vehicle to your house.  I'll follow him there and I'll meet you at your house."

In Plaintiffs' response, they provide a "one minute extract" of the transcribed conversation between Ricky and Det. Vasquez, wherein Det. Vasquez states to Ricky: "Begin to pack your things. I'm going to take you out of the house.  We'll find somebody to stay with you, your sister, your brother or your Aunt Andy.  The reason why is our investigation of your brother has come to an end." [Doc. 76, p. 8.][10]

The conflicting affidavits, deposition testimony, and unclear transcripts create a genuine issue of fact as to whether Ricky drove himself to his sister's house or whether Det. Vasquez drove him, as well as whether Ricky voluntarily went to stay with Leslie or only went because he was directed.

It is undisputed that Det. Vasquez understood Marcos was already staying with his grandparents, was not home on December 16 when he came to serve the subpoena on Ricky, and that Det. Vasquez did not see Marcos on December 16 or at any time until December 19, when

---

[10]Plaintiffs state that the "one minute extract" of the belt tape should not be considered as a verbatim transcript due to the quality of the recordings and encourages the Court to listen to the multiple and lengthy belt tapes that were submitted to the Court but not transcribed.  The Court declines to try to decipher the unclear tapes as noted before.

CYFD spoke to Marcos.  Thus, it is undisputed that Det. Vasquez never removed Marcos from his home.  What is in dispute is whether he illegally prevented the child's return to the Romero residence.

After the conversation with Ricky at the Romero home, Det. Vasquez went to Leslie's apartment and served her with a subpoena.  Ricky was with Leslie at this time.  Det. Vasquez told Leslie words to the effect that he had not taken custody of Ricky and Marcos because CYFD advised him there would be problems with Det. Vasquez assuming custody.

While these facts are not disputed, it is disputed whether Det. Vasquez did or did not take Ricky and Marcos into custody.  For example, in a taped conversation on December 16, 2005, Det. Vasquez told Kristian (Marcos' mother) that "Ricky has been taken out of the house.  We took him out of the house, and we stuck him with Leslie because we couldn't take him out.  Actually we could put him in state custody if we wanted to, but Leslie was willing to take him so we wouldn't have to do that . . . ." [Doc. 47, Ex. 3.] Det. Vasquez also told Kristian during this conversation that Marcos would have to stay with his grandparents "[u]ntil this is pretty much done," referring to the grand jury proceeding.

On December 16, when speaking to Ms. Hosemann (Gabaldon), the grandparent of Marcos, Det. Vasquez told her that "you realize it's our decision.  It's not her [Evelyn's] decision or your decision.  It's the state's decision."  This referred to the decision to have the grandparents keep Marcos longer than the usual weekend visit.  In a conversation with a Romero family friend, Kathleen Roe, Det. Vasquez stated that "just to give you a heads up is that I took custody of Marcos and Ricky as of the last ten minutes."  He further explained he had a court order to do that with CYFD.  Det. Vasquez stated that he had "taken Ricky as well."  "I didn't take him into custody physically.  I just did it over the phone all legally–" He further stated: "it's not going to be a court

order, it's going to be a document from CYFD saying that they're in custody of the state and so therefore they belong to the state now, but they're staying with family members."

In a later phone conversation with Kristian on December 16, Det. Vasquez told her that CYFD "placed Marcos and Ricky into custody and state custody, and they're going to have Marcos stay with [the Hosemanns] for 48 hours, and Ricky is going to stay with Leslie for 48 hours." In another conversation with Ms. Hosemann (Gabaldon), Det. Vasquez said that Marcos "is in our custody, and if you guys can't watch him, then we'll take him into custody and put him into a foster program."

Similarly, CYFD documentation of the evening and incident in question reflect that the "source" (meaning Det. Vasquez) states that "he is taking custody of two children." [Matt Esquibel Dep.] On December 16, 2005, at about 10:18 p.m. a protective services division form was signed by Det. Vasquez showing that Ricky and Marcos were placed in the legal and physical custody of CYFD for 48 hours because there were reasonable grounds to believe the children were in danger from their surroundings and removal from those surroundings was necessary.

The Court determines genuine issues of material fact exist as to whether Det. Vasquez took Ricky and Marcos into custody on December 16, 2005, or the extent of that "custody." In addition, the Court cannot determine the timing of all of the calls between Vasquez, the Romero family and friends and CYFD personnel, which may or may not make a difference in whether Det. Vasquez allegedly took custody of the children.

It is undisputed that at about 5:30 p.m. on December 16, 2005, Det. Vasquez served Mrs. Romero with a grand jury subpoena at her home, and the subpoena related to proceedings concerning Ronnie.

13

At about 8:30 p.m. that night, Det. Vasquez received information from a confidential source ("CI"), whom he characterized as reliable and credible.  The information was that Latasha Davis ("Latasha"), Ronnie's girlfriend and the mother of their two small children, was afraid for herself and their children in the Romero home because Ronnie was in the house.  There was additional information that there might be a domestic violence situation.

Plaintiffs state they have been unable to obtain the identity of the CI, but argue that even before Det. Vasquez talked to the CI at 8:30 p.m., the taped conversations between Det. Vasquez and the Romeros or CYFD indicate Det. Vasquez had taken Ricky and Marcos into custody.  At a minimum, it is unclear when Det. Vasquez received the information from the CI and whether this information contributed to Det. Vasquez's decision to talk with CYFD about Ricky and Marcos. As with the earlier statements from Andy, the CI's information about fear for children or fear of domestic violence is not hearsay if it is offered to show the information presented to Det. Vasquez and whether this is the kind of information on which a reasonably prudent officer would rely.

Defendants assert that Det. Vasquez then called Matt Esquibel ("Esquibel") of CYFD to advise them of the information from the CI.  According to Defendants, Det. Vasquez also told Esquibel about his safety concerns with Ricky and Marcos.  Plaintiffs dispute that the call to Esquibel was made at 8:30 p.m. and assert that Det. Vasquez spoke to Esquibel regarding Ricky and Marcos at about 8 p.m., when Vasquez told Esquibel he was taking custody of the boys.  The Court deems these facts disputed.

Defendants also assert that at about 9:30 p.m. on December 16, CYFD and Santa Fe police officers met with Mrs. Romero at her home and provided her with CYFD documents indicating

Ricky and Marcos were in CYFD custody.[11]  Plaintiffs dispute this fact, stating that the only document Mrs. Romero received during this visit was a "brochure on a parent's guide to abuse and neglect investigation."  This appears to be confirmed by the CYFD narrative of the incident.  Thus, the fact is disputed although not necessarily material.

Defendants contend that Ricky told Det. Vasquez that he felt in danger from his brother on December 16, 2005.  However, Ricky disputes this fact with his affidavit.  It is undisputed, however, that Det. Vasquez believed Ricky could be in danger from his brother on that date.

It is undisputed that Det. Vasquez did not see Ricky after December 16, 2005, and did not see Marcos until December 19, 2005, when Det. Vasquez attended a safe house interview scheduled by CYFD.  From December 16 to December 20, 2005, CYFD was unable to locate Ricky, who was apparently with his sister or aunt.  On December 20, 2005, CYFD returned Ricky and Marcos to Mrs. Romero, having found the allegations of neglect or abuse or danger to the children unsubstantiated.

## Analysis

### I.   QUALIFIED IMMUNITY

Once a defendant asserts the affirmative defense of qualified immunity, the burden shifts to the plaintiff to establish a violation of a constitutional or statutory right by the defendant and that the right alleged to have been violated was clearly established at the time of the defendant's

---

[11]Although not analyzed in this Order, this December 16 visit to the Romero home at 9:30 p.m. is the backdrop for the Fourth Amendment unlawful entry claim.  It is alleged that the information concerning alleged danger to the children or domestic abuse serves as an exception to the warrant requirement.  *See* West v. Keef, 479 F.3d 757, 759 (10th Cir. 2007) (noting that the Supreme Court made clear "that police may enter a home without a warrant where they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury.")

allegedly unlawful conduct.  Currier v. Doran, 242 F.3d 905, 917 (10th Cir. 2002), *cert. denied*, 534 U.S. 1019 (2001); Scull v. New Mexico, 236 F.3d 588, 595 (10th Cir. 2000).

The court is permitted to exercise its sound discretion in deciding which of the two prongs of the qualified immunity should be addressed first in light of the circumstances of a particular case. Pearson v. Callahan, 555 U.S. ___, 129 S.Ct. 808, 818 (2009).  If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity.  Albright v. Rodriguez, 51 F.3d 1531, 1535 (10th Cir. 1995).

In order to satisfy a plaintiff's burden to show that the law was clearly established, the plaintiff need not produce a factually identical case, but may instead show there is a Supreme Court or Tenth Circuit decision on point, or that his or her proposition is supported by the weight of authority from other courts.  Axson-Flynn v. Johnson, 356 F.3d 1277, 1299 (10th Cir. 2004) (internal citation omitted).

> This analysis 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'  Saucier v. Katz, 533 U.S. 194, 201 (2001).  In rebutting a qualified immunity claim at the summary judgment level, a plaintiff 'can no longer rest on the pleadings and the court looks to the evidence before it (in the light most favorable to the plaintiff)[.]'
>
> Once the plaintiff makes this showing, the defendant bears the usual burden of a party moving for summary judgment to show that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. 'More specifically, the defendant must show that there are no material factual disputes as to whether his or her actions were objectively reasonable in light of the law and the information he or she possessed at the time.' . . . The determination . . . is not of the merits of the plaintiff's claims; the defendant may be mistaken and still be entitled to qualified immunity if he or she is reasonably mistaken in light of the law and facts.  Saucier, 533 U.S. at 204.

Axson-Flynn, 356 F.3d at 1299-1300 (some internal citations omitted).

This is not a case where Defendants raised the defense of qualified immunity by motion early in the litigation.  Instead, not until February 2010 did Defendants file this motion for summary judgment, based in part on a qualified immunity defense.  The motion was not completely briefed (after amendments were allowed) until April 30, 2010, just 3-4 weeks before the trial setting.

Typically, qualified immunity should be determined at the earliest stage possible in the litigation. Pearson, 129 S.Ct. at 815.  This is true because a grant of qualified immunity usually entitles a defendant not to face the other burdens of litigation, including discovery.  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  In this case, however, if qualified immunity were granted, Defendants would be relieved from the actual trial only, as the pre-trial motions and pleadings have already been filed in anticipation of the trial date.

Moreover, the Court observes that in Defendants' Answer, the qualified immunity defense was raised only as to the Fourth Amendment claim regarding the illegal entry claim. [Doc. 8, Second Affirmative Defense.] The Fourth Amendment claim, with respect to the warrantless entry of Mrs. Romero's house, is not the subject of the cross-motions.

Whether Defendants took custody of the minor children in violation of due process rights and with the requisite intent to violate their constitutional rights remains in question.  *See* County of Sacramento v. Lewis, 523 U.S. 833, 847-51 (1998) (analyzing what level of intent is required to be sufficiently egregious to state a due process claim; it is not enough to simply do harm; there must be a showing of some sort of intent that varies under the circumstances of each case; however, mere negligence is insufficient).  Defendants did not specifically raise the defense of qualified immunity. [Doc. 8, First Affirmative Defense.] In addition, in the joint status report [Doc. 13, p. 10], Defendants identified a number of motions they contemplated filing, none of which included a motion for qualified immunity.

17

Perhaps that explains, to some extent, the confusing nature of the briefing on the issue of qualified immunity.[12]  For example, Defendants argue Plaintiffs cannot show a Fourth Amendment violation because Det. Vasquez did not take Ricky and Marcos into custody.  The question in these motions is whether Plaintiffs can show a violation of their Fourteenth Amendment due process rights, rather than a Fourth Amendment violation.[13]  [Doc. 59, p. 12.] In Defendants' reply, they again argue that Det. Vasquez did not violate Plaintiffs' Fourth Amendment rights by taking custody of Ricky or Marcos.  [Doc. 78, pp. 9-10.] Defendants' reliance on Fourth Amendment cases concerning an unlawful seizure is not helpful.

Plaintiffs aptly note that Defendants' argument regarding a Fourth Amendment seizure is inapplicable.  There is no dispute that Ricky and Marcos were not arrested, searched, or seized like criminal suspects.  Rather, the argument, for purposes of these motions is whether Det. Vasquez is entitled to qualified immunity regarding the Fourteenth Amendment claims of procedural and substantive due process violations.

### A.    *Qualified Immunity as to the Procedural Due Process Claim*

In their motion for summary judgment, Plaintiffs provide a number of cases from the United States Supreme Court, Tenth Circuit and other circuits concerning the applicable law they claim Defendants violated.  *See, e.g.,* Gomez v. Wood, 451 F.3d 1122, 1127-28 (10th Cir. 2006); Santosky v. Kramer, 455 U.S. 745, 753-54 (1982) (state officials may not remove children from the home, through temporary seizures without due process of law); J.B. v. Washington County, 127 F.3d 919, 927 (10th Cir. 1997) (states have a "traditional and transcendent" interest in protecting children from

---

[12] The helpful qualified immunity analysis is provided by Plaintiffs in their motion for partial summary judgment rather than in their response to Defendants' motion based on qualified immunity.

[13] Defendants did eventually argue that Det. Vasquez was entitled to qualified immunity on the due process claims, but it did not appear to be Defendants' primary argument as to qualified immunity. [Doc. 59, pp. 16-17.]

abuse); <u>Spielman v. Hildebrand</u>, 873 F.2d 1377, 1385 (10th Cir. 1989) (due process requires that state agency when removing children from a home must give parents prior notice and a hearing, except in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event"); <u>Hollingsworth v. Hill</u>, 110 F.3d 733, 739 (10th Cir. 1997) (extraordinary situations include emergency circumstances which pose an immediate threat to the safety of a child). The Court concludes Plaintiffs satisfied their burden in demonstrating the existence of clearly established law regarding the alleged due process violation. Moreover, taking Plaintiffs' allegations as true, they satisfied their burden in demonstrating an alleged violation of a constitutional or statutory right.

At this point, Defendants must show that there are no material factual disputes as to whether Det. Vasquez's alleged actions were objectively reasonable in light of the law and the information he possessed at the pertinent time.

It appears undisputed that Ricky and Marcos were not to return home for a few days in the December 16-20, 2005 time frame. However, it is disputed or unclear whether Det. Vasquez, by suggesting the children stay with other family members, actually removed the children or took custody of them and whether he did so with the requisite intent to violate their rights. These facts are in dispute. It is undisputed that there were no prior hearings or notice to Mrs. Romero before these events occurred. However, it is disputed whether Det. Vasquez's belief that emergency conditions existed, sufficient to pose an immediate threat to Ricky and Marcos on December 16, 2005, was reasonable.

Based on the circumstances of this case and for the reasons discussed *supra*, the Court determines that genuine issues of material fact exist as to whether Det. Vasquez took custody of Ricky and Marcos, or whether he "removed" them from Ms. Romero's home. In addition, the Court

finds the existence of a genuine factual controversy regarding whether Det. Vasquez reasonably believed that the children were in danger to the extent that they could not remain in Mrs. Romero's home as of December 16, 2005.  The Court realizes that Det. Vasquez still could be entitled to qualified immunity even if he was mistaken about his beliefs regarding the childrens' safety. However, the disputed issue of fact concerns the reasonableness of his belief.  *See* Axson-Flynn, 356 F.3d at 1300 (defendant can still be entitled to qualified immunity if he is reasonably mistaken in light of the law and facts) (internal citation omitted).

This factual controversy is evidenced by Ricky's affidavit wherein he states he did not complain to Det. Vasquez on December 15 or 16 that he feared Ronnie, and also because key portions of the recorded conversation between Det. Vasquez and Ricky are inaudible.  Moreover, there is no evidence that Det. Vasquez had any information concerning a history of a threatening relationship between Marcos and Ronnie, or that Marcos feared Ronnie.[14]  Det. Vasquez had not spoken to Marcos.

## B. *Qualified Immunity as to the Substantive Due Process Claim*

Plaintiffs again identified Tenth Circuit law that they claim was clearly established at the pertinent time.  The "familial right of association is properly based on the 'concept of liberty in the Fourteenth Amendment.'"  Griffin v. Strong, 983 F.2d 1544, 1547 (10th Cir. 1993) (internal citations omitted).  The "right to associate with one's family is a very substantial right."  Id. at 1548.  A court must weigh the interests of the state against the interests in the familial right of association.  Id. at 1547.

---

[14]There is disputed information, on the other hand, of a threatening relationship between Ronny and Ricky, between Ronnie and his mother, and even between Ronnie and his girlfriend.

> In classic fourteenth amendment liberty analysis, a determination that a party's constitutional rights have been violated requires "a balancing [of] liberty interests against the relevant state interests." <u>Youngberg v. Romeo</u>, 457 U.S. 307, 321, 102 S.Ct. 2452, 2461 (1982). This balancing of interests has been applied in cases involving intimate association rights. *See* <u>Winston ex rel. Winston v. Children & Youth Servs.</u>, 948 F.2d 1380, 1391 (3d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 2303 (1992).

<u>Id.</u> at 1547 (internal citations omitted). Part of the balancing process includes determining the State's interest in protecting children it believes may be endangered and weighing those interests against the mother's interest in familial association.

Plaintiffs claim that the balance in this case weighs in their favor and that Det. Vasquez did not have sufficient reasonable grounds to believe that the children were in danger at the Romero home. Accordingly, taking Plaintiffs' allegations as true, including allegations of Det. Vasquez's intent to violate rights, they satisfied their burden in demonstrating an alleged violation of a constitutional or statutory right.

The Court again concludes that there are disputed facts, for the same reasons articulated above, as to whether Det. Vasquez reasonably believed, even if mistaken, that Ricky and Marcos were endangered. Thus, because that portion of the equation is in dispute, the Court cannot properly determine the balance of interests.

However, the Court observes that this claim may well be subject to early dismissal at trial. This is true because "[t]he right of intimate association is not absolute." <u>Id.</u> at 1549. Even if it can be determined that Det. Vasquez had no reasonable belief that Ricky and Marcos were in danger on December 16, 2005, and that there was an infringement of the right of familial association, that infringement appears slight. Under the circumstances of this case, Ms. Romero was allegedly deprived of her two children, in the family home, for no longer than a four-day period. No evidence

was evidence presented showing that Mrs. Romero was prohibited from seeing her children at other locations.  In addition, Mrs. Romero would not have seen Marcos in any event during two to three days of that period.  Ricky freely associated with his sister and his aunt during that time and apparently came and left at will.  It is extremely questionable, under these facts, whether Det. Vasquez's actions unduly interfered with Mrs. Romero's right of familial association with Ricky and Marcos.

Notwithstanding the apparent weakness of the claims,[15] the Court denies the motion for summary judgment based on qualified immunity, because there are genuine factual issues in controversy.  Defendants may again raise the defense of qualified immunity or other pertinent motions at the appropriate time during trial.

II.      SUMMARY JUDGMENT

Summary judgment will be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  Applied Genetics Int'l, Inc. v. First Affiliated Sec. Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).

Here, where the parties have filed cross motions for summary judgment, "[the court is] entitled to assume that no evidence needs to be considered other than that filed by the parties, but

_____

[15]At times, Plaintiffs' briefing of the issues verges on hyperbole.  For example, Plaintiffs hypothesize: "If Marcos had gone on a sleepover that weekend, could Det. Vasquez legally have called the parents at the sleepover and told them to keep Marcos indefinitely, like a prisoner at Guantanamo?  Obviously not.  Yet that is exactly what happened when he told Eileen (Gabaldon Hosemann) to keep Marcos there 'until further notice.'" [Doc. 64, p. 13.] The Court advises counsel for both parties to again consider the possibility of settling this case.  Not only do both parties have significant hurdles to overcome with credibility issues as to key witnesses, any constitutional deprivations, if proven, appear slight.

summary judgment is nevertheless inappropriate if disputes remain as to material facts." James Barlow Family Ltd. Partnership v. David M. Munson, Inc., 132 F.3d 1316, 1319 (10th Cir. 1997), *cert. denied*, 523 U.S. 1048 (1988).  In this regard, each party as the nonmovant is given "wide berth to prove a factual controversy exists."  Jeffries v. Kansas, 147 F.3d 1220, 1228 (10th Cir. 1998) (internal citation omitted), *rev'd on other grounds by* Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998).  Therefore, the legal standard remains the same – each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law.  Atlantic Richfield Co. v. Farm Credit Bank, 226 F.3d 1138, 1148 (10th Cir. 2000).

In addition to the question of qualified immunity, both parties seek partial summary judgment as to liability on the due process claims.  Under these circumstances, the analysis overlaps with the qualified immunity analysis, and the Court does not repeat its entire reasoning why factual disputes exist.  *See* discussion *supra*.

Briefly, however, the Court again notes that there are factual disputes whether Det. Vasquez separated, removed, or took custody of Ricky or Marcos on December 16, 2005, or for any part of that weekend, with the requisite intent to deprive Plaintiffs of their constitutional rights, and whether there were circumstances that led Det. Vasquez to reasonably believe the children were in danger on that date.

Moreover, the Court observes inherent conflicts between the statements of Det. Vazquez and Ricky, as well as internal inconsistencies within their own statements.  For example, on August 5, 2005, the transcribed belt tape verifies that Ricky clearly complained of Ronnie and stated he feared Ronnie, did not feel safe around Ronnie, did not trust Ronnie, knew Ronnie had a knife and possibly a gun, heard Ronnie tell him (Ricky), that Ronnie would kill him, saw Ronnie engaging possibly in

23

drug transactions at the house, saw Ronnie use drugs, did not want to be around Ronnie "until everything is settled," and wanted to live elsewhere away from Ronnie. [Doc. 59, Ex. B.] Five years later, Ricky filled out an affidavit for purposes of this lawsuit, and his statements regarding Ronnie are about 180 degrees different than his contemporaneous statements in August 2005, albeit unsworn statements. Ricky's affidavit contends that he was not afraid of his brother, that he was unaware of any drug use or violence, and that he had no interest or desire to stay at a relative's home rather than his own. [Doc. 64, Ex. 13.] The conflicts appear inexplicable.

In addition, Ricky's affidavit contradicts belt tape statements made on December 16, 2005,[16] and conflict with Det. Vazquez's testimony that Ricky was willing to voluntarily leave his home on December 16, packed his bags, and got into his own car and drove himself to his sister's home. Now, in his 2010 Affidavit, Ricky contends he was driven to his sister's home in the backseat of Det. Vasquez's vehicle or an unmarked police car.

Neither party attached any portion of a deposition of Ricky to the summary judgment pleadings. Assuming a deposition was taken, it is not certain how Ricky's deposition testimony might square with his affidavit or his earlier unsworn taped conversations. It is clear that Ricky's credibility is in question.

Det. Vazquez's own statements also are contradictory. In some instances, he contends that he never took custody of Ricky, and, yet, in statements to others, he refers to having taken custody

---

[16]Granted, the belt tape transcription (referred to as CH1) of the conversation between Det. Vasquez and Ricky on Dec. 16 is incomplete. Many portions are noted "inaudible." [Doc. 59, Ex. F.] The Court observes that Defendants attach yet another transcript of this belt tape, to Doc. 69, as Ex. J. This transcript also is incomplete, portions of which are marked "inaudible." It is not clear why Defendants provided the Court with two incomplete transcripts of the conversation. However, Plaintiffs explain that CH1 consists of conversations on December 16, 2005 with Ricky and Leslie and that the tape lasts more than 1.5 hours. [Doc. 47, p. 6.]

of the boys and placing them with relatives.  In his deposition, Det. Vasquez is not clear whether CYFD took custody of Ricky and Marcos at any time.

> Q.    It's your understanding that CYFD did at some point in the day [take custody of Ricky and Marcos]?
>
> A.    They weren't taken into custody.
>
> Q.    They weren't taken into custody at all?
>
> A.    They were not.  The reason why, Marcos was already with his grandparents, who – I guess, that weekend, he was supposed to meet them anyway.  And Ricky went on his own to his sister's house.
>
> Q.    So CYFD never exercised custodial control.
>
> . . .
>
> A.    Again, I don't know if CYFD was involved.  They spoke with the grandparents of Marcos.  Again, I'm not sure what that entailed upon investigation.

[Doc. 47, Ex. 2, p. 42.] In contrast with his deposition testimony, it is undisputed that Det. Vasquez made statements to the contrary to Romero family members and friends on December 16, 2005, and to CYFD staff.  Moreover, Det. Vasquez signed a form on December 16, 2005 at 10:18 p.m. stating there was reasonable grounds to place Ricky (and Marcos) in the "legal and physical custody of the CYFD for 48 hours" because Det. Vasquez had reasonable grounds to believe the children were in danger from their surroundings. [Doc. 47, Ex. 11.]

The Court concludes that genuine issues of fact exist as to the due process claims concerning Ricky.  Accordingly, the motions for summary judgment are denied.

The circumstances relating to Marcos are different in some respects.  Unlike Ricky, Det. Vazquez never personally met with Marcos until the CYFD visit on December 19, 2005.  Marcos was already staying at his paternal grandparents on the weekend of December 16, 2005, when Det.

Vasquez served Ricky with a subpoena at the house.  Thus, it is undisputed that Det. Vasquez did not remove or cause Marcos to be removed from his mother's home on December 16, 2005.

However, evidence was presented that Det. Vasquez spoke to Marcos' biological mother, Kristian, on December 16, 2005, and told her Marcos was staying with the Hosemanns "until this is pretty much done," meaning the grand jury proceedings, which were not predicted to end until mid-January 2006.  Det. Vasquez also told Kristian that Marcos was not allowed anywhere near Ronnie and thus, could not be in Mrs. Romero's house.  Evidence was presented showing Det. Vasquez spoke to the Hosemanns on December 16, 2005, and informed them that Marcos, who was already with them, needed to stay with them "until further notice." [Doc. 69, Ex. I.] On December 16, 2005, Det. Vasquez told Kathleen Roe, a friend of the Romeros, that "I took custody of Marcos and Ricky as of the last ten minutes." [Doc. 69, Ex. I.] Det. Vasquez further explained to Ms. Roe that it was "our decision, my decision" that Marcos remained with the Hosemanns rather than go to Mrs. Romero's parents' house.

While the alleged circumstances concerning Marcos' situation are different than those regarding Ricky, the Court concludes that similar factual issues remain – whether Det. Vasquez's decision or recommendation that Marcos should continue to stay with the Hosemanns constituted removing the boy from his mother's house; and whether Det. Vasquez had reasonable grounds to believe that returning Marcos to the Romero house after his weekend with the Hosemanns would pose a significant danger to Marcos, thereby justifying Det. Vasquez's decision or recommendation. Accordingly, the motions for summary judgment are denied as to the due process claims relating to Marcos.

This case will go forward with Plaintiffs' due process claims against Det. Vasquez, the Fourth Amendment claims relating to the unlawful entry of the Romero home against Defendants, including Lt. Johnson, as well as Plaintiffs' claims under the New Mexico Tort Claims Act.[17]

IT IS THEREFORE ORDERED that the cross motions for summary judgment are DENIED and that the Santa Fe Police Department is dismissed with prejudice.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge

---

[17]The Court dismisses the Santa Fe Police Department because generally governmental sub-units, like city police departments, are not separate suable entities that may be sued under § 1983. *See* <u>Martinez v. Winner</u>, 771 F.2d 424, 444 (10th Cir. 1985) ("The 'City of Denver Police Department' is not a separate suable entity").